AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| United States of America | | **FILED**<br>CLERK, U.S. DISTRICT COURT<br><br>3/10/2023<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: _____ jm ___ DEPUTY |
| v. | | |
| Yossi Engel, | Case No. 2:23-mj-01122-duty | **LODGED**<br>CLERK, U.S. DISTRICT COURT<br><br>3/10/2023<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: _____ jb ___ DEPUTY |
| Defendant | | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of September 18, 2018, in the county of Los Angeles in the Central District of California, the defendant, Yossi Engel, violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/ Phyllis M. McLean
*Complainant's signature*

Phyllis M. McLean, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:         3/10/2023

_____
*Judge's signature*

City and state:   Los Angeles, California        Hon. Michael R. Wilner, U.S. Magistrate Judge
*Printed name and title*

AUSA: Steven M. Arkow (x6975)

**<u>AFFIDAVIT</u>**

I, Phyllis M. McLean, being duly sworn, declare and state as follows:

## I.   <u>INTRODUCTION</u>

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since June 2021. I am currently assigned to a Complex Financial Crime squad of the FBI's Los Angeles Field Office, which is responsible for investigating corporate and securities fraud, including mail fraud, wire fraud, securities fraud, and insider trading.  My training included 21 weeks of FBI Special Agent Training at the FBI Academy in Quantico, Virginia.  Before becoming a Special Agent, I worked within the FBI as an Investigative Specialist from 2013 to January 2021.  As an Investigative Specialist I conducted surveillance and prepared written surveillance documents.  Additionally, I obtained a Bachelor of Science degree in Criminal Justice from Murray State University, Kentucky, in 2010.

2.    In addition to my formal training and personal experience, I have learned from and worked alongside numerous senior FBI agents with years of experience in investigations of various fraud crimes, including, but not limited to, corporate and securities fraud, mail fraud, wire fraud, securities fraud,

and insider trading.  As a result of my training and experience in investigating fraudulent schemes, I have become familiar with the types of records and documents that individuals and entities use to perpetrate their schemes, and I have participated in the execution of search warrants at homes and businesses of individuals involved in fraudulent schemes.

## II.  PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of a criminal complaint and arrest warrant for YOSSI ENGEL ("ENGEL") for wire fraud in violation of 18 U.S.C. § 1343.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and amounts are approximate.

5.    Based on the facts set forth below, there is probable cause to believe that ENGEL has violated 18 U.S.C. § 1343 (wire fraud).

### III.   <u>STATEMENT OF PROBABLE CAUSE</u>

**A.   Summary of Investigation**

6.   To date, my investigation has shown that ENGEL orchestrated a fraud scheme in which he made false representations and employed forged documents to induce victims to make investments in and/or provide loans for ENGEL's business, IWITNESS TECH ("IWITNESS"), and for properties ENGEL falsely claimed to own and be developing in Israel.

7.   ENGEL, individually and through his company IWITNESS, used his community relationships to perpetrate a multi-million-dollar fraud scheme that impacted victims in the Orthodox Jewish communities in the Los Angeles and New York metropolitan areas from as early as in or around September 2018 through in or around January 2021.

8.   According to witnesses and victims, ENGEL claimed to need money in the form of short-term loans with high rates of return for IWITNESS' business operations, namely, the purported purchase and installation of security cameras for IWITNESS' customers.[1] ENGEL induced victims to lend money to ENGEL by

_____

[1] ENGEL offered short-term investments/loans in IWITNESS that ranged from $15,000 to $1.3 million. The duration of the investments/loans was for two weeks to six months and provided for 10-60% annualized interest. In some instances, the loans were memorialized through promissory notes signed by ENGEL. In some instances, the notes contained language asserting that the notes were to be secured by an obligation to IWITNESS supported by an IWITNESS invoice to an IWITNESS customer purportedly

falsely promising he would use their funds to purchase security camera equipment in order to fulfill existing contracts with IWITNESS customers.

9.   In another part of ENGEL's scheme to defraud victims, starting in or about 2020, ENGEL told victims that he needed money to purchase and develop properties in Israel. ENGEL induced victims to invest by falsely promising ENGEL would sell the redeveloped properties and share the profits with investors.

10.   Engel falsely told investors ENGEL needed private investments in IWITNESS and ENGEL's real estate projects because ENGEL could not borrow money from banks at lower interest rates because ENGEL was from Israel and did not have sufficient credit in the United States.

11.   According to witness statements, financial records, and other evidence collected throughout the course of my investigation, ENGEL did not use the victims' funds as promised to purchase security camera equipment for IWITNESS or to develop properties in Israel.  Instead, ENGEL made materially false statements to victim investors and misappropriated victim funds for his personal benefit and to make Ponzi payments to perpetuate ENGEL's fraud scheme. For example:

---

reflecting the referenced obligation, i.e., payment due to IWITNESS for providing surveillance equipment and installation services to the IWITNESS customer.

a.   ENGEL told victims IWITNESS had large, lucrative business contracts with many clients. According to IWITNESS employees who were interviewed during the course of my investigation, IWITNESS did not have much business, did not have any large contracts, and there were times when workers sat around waiting for work while ENGEL slept on a couch.

b.   To convince victims to lend money to or invest in IWITNESS, ENGEL used false and fraudulent IWITNESS invoices in promissory notes and provided copies of false and fraudulent IWITNESS invoices to victims. When investigators contacted the companies listed on the invoices, the companies either did not have any record of business contracts with IWITNESS or did not have record of the high dollar invoice ENGEL mentioned and/or included in the promissory notes.

c.   ENGEL used a video depicting ENGEL socializing with the mayor of Bnei Brak, Israel, to convince victims to invest with or lend ENGEL money for the purpose of developing property in Bnei Brak in Israel. ENGEL claimed to have met with the mayor concerning ENGEL's real estate deals in Bnei Brak. Later, during a meeting with victim investors, ENGEL admitted that he did not have a close relationship with the mayor of Bnei Brak and the recorded meeting with the mayor was not a conversation regarding the development of properties in Israel.

d.   ENGEL used fraudulent Israeli land documents, including fake documents, that purported to show that ENGEL was the owner of those properties, when, in fact, as I learned during the course of the investigation, ENGEL had no such history of property ownership or registry for the properties in Israel.  Through these fake real estate documents and the promise of lucrative returns and using ENGEL's trusted position in the Orthodox Jewish community, ENGEL lulled existing victims and encouraged new victims to send ENGEL money.

e.   When a real estate investor noticed ENGEL had transferred his funds to an unknown third party rather than the promised development project, ENGEL told the investor the money had been sent to the third party because the third party could change the funds into Israeli currency (shekels) at a lower rate than the banks were willing to do. In reality, the third party the investor sent money to was another victim investor and the money was to pay off money ENGEL owed as a result of a previous deal.

12.  After ENGEL's scheme collapsed and the victims realized that ENGEL had defrauded them, on February 7, 2021, ENGEL signed a notarized document entitled "Stipulation for Entry of Judgment."  In the "Stipulation for Entry of Judgment," ENGEL made the following admissions: (1) ENGEL owned and controlled IWITNESS; (2) ENGEL told the individuals A.L2., M.S.,

6

F.F., M.J., O.K., M.C., and E.F. that ENGEL was seeking capital from investors for the purpose of capital appreciation and return of principal; (3) at the time ENGEL made these representations, unbeknownst to the above-referenced individuals, ENGEL intended that the funds obtained from them would be used for ENGEL's own personal benefit and not for investment with the goal of capital appreciation; (4) ENGEL directed and encouraged A.L2. to recruit[2] others to invest in IWITNESS, knowing that the funds the others provided would be converted for ENGEL's sole, personal benefit and not used for any legitimate purpose; (5) ENGEL took steps to actively conceal his fraudulent intent and practice from these individuals; and (6) ENGEL manipulated official government documents and banking documents to perpetuate and further his conversions of the funds of these individuals.

**B.   Background on ENGEL**

13.   Based on interviews with victims and others and records checks, I learned that ENGEL lived in the Los Angeles, California, area during the events described in this affidavit.

---

[2] Based on an interview with A.L2., I learned that ENGEL provided A.L2. with land title documents purporting to show that ENGEL owned properties in Israel. A.L2. provided the land title documents to other investors. As noted above, during the course of the investigation, I received information indicating there is no history of land ownership or registry in ENGEL's name in Israel.

In March 2021, after his fraud scheme collapsed, ENGEL fled the United States to Israel. I believe that since that time ENGEL has lived and currently lives in Israel but temporarily returned to the Los Angeles area on February 13, 2023. Victim A.L., discussed below, was located in the Central District of California during his dealings with ENGEL and when, as a result of the scheme, he provided money to ENGEL.

14. Based on my review of California Secretary of State records, I learned that ENGEL owned and operated the Los Angeles-based IWITNESS, a California limited liability company formed and founded by ENGEL in about 2018. Based on reviewing the IWITNESS website, I learned that IWITNESS was in the business of installing residential and commercial security systems.

15. According to victim and witness interviews, ENGEL was a respected member of an Orthodox Jewish synagogue in Los Angeles. ENGEL met victim investors through the synagogue, as well as through introductions made by other members of the Jewish community living in Los Angeles and New York.

C. **ENGEL Solicits Funds From Victims**

Victim A.L. ("A.L.")

16. Based on my interview of A.L., and review of documents and records A.L. provided, I learned the following:

8

a.   A.L. owned many car dealerships. A.L. and ENGEL
had a mutual friend named D.J. A.L. had known D.J. for a long
time and trusted D.J. D.J. partnered with A.L. on some car
projects. D.J. introduced A.L. to ENGEL in person at ENGEL's
IWITNESS office. A.L. also knew ENGEL through the Jewish
community. A.L. knew ENGEL was involved in charities and ran a
synagogue. D.J. pitched investing and lending ENGEL money to
help ENGEL expand IWITNESS.  IWITNESS needed capital and would
provide good returns on investments.  A.L. visited IWITNESS's
office and saw trucks, employees, and equipment so that it
appeared to be a legitimate business.  After speaking with D.J.
and ENGEL, A.L. began to invest and/or lend ENGEL money.

17.  A.L. did not give money to ENGEL for ENGEL's personal
use.  When A.L. first started lending money to ENGEL, the loans
were for the business operations of IWITNESS.  A.L. later gave
ENGEL money for real estate investments in Israel.  For the real
estate investments, ENGEL sent A.L. documents like contracts,
proof of ownership, and project plans.  Based on information he
received from ENGEL, A.L. thought ENGEL purchased properties in
Israel.  A.L. later found out, after he gave ENGEL money, that
the documents ENGEL provided for the real estate deals in Israel
were fake.  Based on ENGEL's statements and representations,
A.L. understood that the money A.L. gave ENGEL was to be used as
an investment or loan for business purposes.  A.L. would not

have loaned or invested with ENGEL if A.L. thought ENGEL was going to use the money for anything other than the stated business purpose.

Victim A.L. Wires $280,000

18. A promissory note was prepared between ENGEL and A.L. dated September 14, 2018, for $280,000. The promissory note states, "The principal and interest due in this Promissory Note shall be secured by the obligation of I-Witness Tech documented in Invoice #1653." In the beginning, ENGEL would send IWITNESS invoices to A.L. so A.L. would be comfortable lending ENGEL money. The IWITNESS invoices that ENGEL provided A.L. represented how A.L.'s money would be spent. A.L. believed that the money A.L. gave ENGEL was to be used to purchase cameras in connection with IWITNESS Invoice 1653.

19. I have reviewed IWITNESS Invoice #1653. The invoice purports to have been issued to a customer called JDC Warehousing to which IWITNESS had purportedly provided services, and claims payment due to IWITNESS in the amount of $520,599.99. During an interview conducted with representatives of JDC Warehousing, I confirmed that JDC Warehousing had not received IWITNESS invoice #1653, and IWITNESS did not perform the large amount of work listed on the invoice to JDC Warehousing. Following the wire from A.L., IWITNESS did not receive a payment from JDC Warehousing for $520,599.99.

20.  On September 18, 2018, A.L. sent a wire of $280,000[3] to ENGEL at ENGEL's personal Banner Bank Account ending in 0869[4] ("the 0869 account") in connection with the above-described promissory note and in reliance on its false representations.

D.  **Analysis of How A.L.'s $280,000 was spent**

21.  I reviewed bank records belonging to ENGEL and learned the following information. Before the wire from A.L. the balance of ENGEL's 0869 account, on which ENGEL is the only signer, was $70. The balance of ENGEL's 0869 account after the $280,000 wire from A.L. was $280,070. On September 18, 2018, there were two withdrawals from ENGEL's 0869 account: (a) one for $20,000; and (b) a second for $63,000; $3,100 was transferred from ENGEL's 0869 account to a Banner Bank account held in the name of Congregation Bais Gavriel ending in 5436[5]; and there were also two online transfers in the amount of $3,500 and $60,000 to another Banner Bank personal bank account in ENGEL's name ending

---

[3] Based on bank records I reviewed, I learned that the wire was conducted through the Fedwire system.  Based on my experience and training and information from other law enforcement agents, I know that since 2009 domestic wires for funds transferred via the Fedwire Funds service have been processed through either Texas or New Jersey.

[4] Based on a review of bank records, I learned that ENGEL was the only signer on the account.

[5] Based on a review of bank records on the Congregation Bais Gavriel Banner Bank account ending in 5436, I learned that ENGEL was a signer on the account from August 31, 2018, to February 7, 2020.

in 0877 ("ENGEL's 0877 account").[6] On September 19, 2018, there was a wire of $120,200 from ENGEL's 0869 account to D.J.  Thus, within a day of receiving A.L.'s wire, ENGEL had withdrawn, transferred, or spent $269,600, nearly all of the amount A.L. wired.

22.  Of the $60,000 of A.L.'s money that ENGEL transferred to ENGEL's 0877 account, such funds were spent in the following ways:

(a) check 477 for $7,110 payable to Moneynet Eben Gvirol Ltd (a currency exchange company in Israel);

(b) check 206 for $30,000 to SB Lumber;

(c) check 232 and check 278 for $15,000 and $10,000, both written to CLY (Congregation Levy Yitzchak, which is located in Los Angeles);

(d) check 126 for $2,010 to Moneynet Even Gvirol Ltd (a currency exchange company in Israel);

(e) a $2,000 American Express credit card payment;

(f) $301 to Zavala;

(g) $99.99 as a fee;

(h) $180 withdrawal of cash; and

(i) $11,350 in possible payments to IWITNESS employees.

---

[6] Based on a review of bank records, I learned that ENGEL was the only signer on the account.

Based on a review of ENGEL's bank accounts and tracing how the $280,000 from victim A.L. appears to have been spent, there is a noticeable absence in the above expenditures consistent with ENGEL's claims that he would use A.L.'s funds to purchase equipment and pay for IWITNESS business projects, other than the possible payments to IWITNESS employees.

23.  A.L. had multiple investments and loans with ENGEL after September 18, 2018. While ENGEL did repay some of the money to A.L., ENGEL did not repay A.L. all of the money A.L. gave ENGEL as he had represented and promised he would. A.L. believed some investment(s) and/or loan(s) were rolled into other investments and/or loans with ENGEL which A.L. provided additional money for.

<ins>Victim A.L. Wires $660,000 to ENGEL's IWITNESS account</ins>

24.  On December 29, 2020, A.L. loaned $660,000 to ENGEL for IWITNESS. A.L. wired $460,000[7] from A.L.'s personal account and $200,000 from A.L.'s business account to ENGEL's IWITNESS account at Commercial West Bank ending in 2353[8] ("the 2353

---

[7] Based on bank records I reviewed, I learned that the wire was conducted through the Fedwire system.  Based on my experience and training and information from other law enforcement agents, I know that since 2009 domestic wires for funds transferred via the Fedwire Funds service have been processed through either Texas or New Jersey.

[8] Based on a review of bank records, I learned that ENGEL was the only signer on the account.

account"). ENGEL provided A.L. with a promissory note which stated: "The principal and interest due in this Promissory Note shall be secured by the obligation of I-Witness Tech documented in Invoice #2142."

**E.  Analysis Of How A.L.'s $660,000 Was Spent**

25.  I reviewed the 2353 account and learned the following transactions occurred within about the same day after victim A.L.'s $660,000 was wired into that account:

(a)  $4,750 was transferred to Lendora Funding;

(b)  $1,282.94 was transferred to Lincoln AFS Ford Credit;

(c)  $30 was debited as a wire fee;

(d)  Check 1126 for $180,575 was issued to another victim ("A.L2.")[9] A.L2.'s company to pay off a previous investment;

(e)  check 1128 for $149,850 was issued to A.L2.'s company;

(f)  Check 1129 was issued to A.L2.'s personal account for $143,431;

(g)  check 1130 for $244,300 was issued to D.L.; and check 1131 for $13,000 was issued to Mazel Associates.

26.  Based on a review of ENGEL's bank accounts and tracing

---

[9] During the investigation I learned that A.L2. was another victim who loaned ENGEL money.

14

the $660,000 from victim A.L., there is a noticeable absence in the bank records of expenditures consistent with ENGEL's claims that he would use A.L.'s funds to pay for IWITNESS projects and instead the funds appeared to have been primarily used to repay victims to include A.L2.

27.   On January 7, 2021, not long after A.L. wired ENGEL the $660,000, ENGEL closed the 2353 account and withdrew the remaining balance of $253.24.

28.   When I interviewed A.L., A.L. told me that A.L. reached out multiple times to ENGEL for repayment on the $660,000 loan and ENGEL provided the following excuses:

(a)   ENGEL just got out of the hospital and would send the money shortly;

(b)   ENGEL would personally transfer the money to A.L. in the morning; and

(c)   ENGEL was sick but ENGEL would send the money to A.L. on January 4, 2021.

29.   A.L. informed me during that interview that, notwithstanding ENGEL's representations, he has not been repaid any of the $660,000 loan in accordance with ENGEL's promises and the terms of the promissory note.

**F.   A.L. And D.J. Communications With ENGEL**

30.   During my interview of A.L., I learned that on January 5, 2021, A.L. had spoken with D.J. regarding ENGEL.   D.J. told

A.L. that everything with ENGEL was fake, ENGEL had fled the United States, and ENGEL was not responding to anyone.  A.L. messaged ENGEL to discuss the money ENGEL still owed to A.L. A.L. wanted to try and recover some of the money A.L. gave to ENGEL.

31.  I have reviewed an email dated January 7, 2021, from ENGEL to D.J. which stated the following, in relevant part: "It's time for once to be honest, the only way money will ever come back is if I figure out a new life and like a normal person make money slowly but surely, that's the only way I will ever be able to pay back what I owe. I can only imagine how disappointed and mad you must be now, I truly hope one day you'll be able to forgive me."

G.   **ENGEL Admits to Defrauding Victims**

32.  Based on interviews with victims and review of records, I learned that on February 7, 2021, ENGEL signed a notarized document entitled "Stipulation for Entry of Judgment."[10] In the "Stipulation for Entry of Judgment," Engel

---

[10] At the end of the document, it states: "IT IS SO STIPULATED" and is signed by ENGEL, as an individual, and signed by ENGEL on behalf of IWITNESS TECH. During an interview with the notary listed on the document, the notary confirmed ENGEL himself signed the document, and ENGEL was not forced or coerced by any individual to sign the document.  The document is styled as a pleading that was prepared for filing in the Superior Court of California in Los Angeles County in which the caption names the plaintiffs as A.L., M.S., F.F., M.J., O.K., M.C., and E.F. against defendants YOSSI ENGEL and IWITNESS

made the following admissions: (1) ENGEL owned and controlled IWITNESS; (2) ENGEL told the individuals A.L2., M.S., F.F., M.J., O.K., M.C., and E.F. that ENGEL was seeking capital from investors for the purpose of capital appreciation and return of principal; (3) at the time ENGEL made these representations, unbeknownst to the above-referenced individuals, ENGEL intended that the funds obtained from them would be used for ENGEL's own personal benefit and not for investment with the goal of capital appreciation; (4) ENGEL directed and encouraged A.L2. to recruit[11] others to invest in IWITNESS, knowing that the funds would be converted for ENGEL's sole, personal benefit and not used for any legitimate purpose; (5) ENGEL took steps to actively conceal his fraudulent intent and practice from these individuals; and (6) ENGEL manipulated official government documents and banking documents to perpetuate and further his conversions of the funds of these individuals.

33. The "Stipulation for Entry of Judgement" states that monetary judgment shall be entered against defendants (ENGEL and

---

TECH, LLC.  The investigation has not determined that the document or related complaint was filed in a court.

[11] Based on an interview with A.L2., I learned that ENGEL provided A.L2. with land title documents purporting to show that ENGEL owned properties in Israel. A.L2. provided the land title documents to other investors. During the course of the investigation, I received information indicating there is no history of land ownership or registry in ENGEL's name in Israel.

IWITNESS) as follows: (1) $1,688,000 to M.S.; (2) $575,000 to
F.F.; (3) $1,300,000 to M.J.; (4) $990,000 to O.K.; (5)
$1,150,000 to M.C. and E.F.; and (6) $735,500 to A.L2.

## H.   SEC Files Complaint against ENGEL

34.  On January 12, 2023, the Securities and Exchange
Commission ("SEC") filed a complaint, <u>Securities and Exchange
Commission v. Yossi Engel</u>, CV 23-213-PA-JPR, in the Central
District of California, alleging that defendant ENGEL, through
his company IWITNESS, used his community ties to perpetrate a
$47 million affinity fraud – a fraudulent securities offering
targeting members of the Orthodox Jewish communities in Los
Angeles and New Jersey between about 2018 and 2021.  The SEC
complaint alleges, among other things, that ENGEL made false and
misleading statements about IWITNESS's business and a land
development scheme that ENGEL knew "was based on lies."  The SEC
complaint also states the ENGEL sent over $2.5 million to
currency exchangers in Israel, that ENGEL withdrew over $861,000
in cash, and that ENGEL also used some of the money to fund
elements of a lavish lifestyle, including that he spent $56,880
at casinos and to fly on private jets at least twice.

## I.   ENGEL'S Travel Records

35.  Based on my review of a law enforcement database, I
learned the following. ENGEL departed the United States for
Israel on March 11, 2021, roughly a month after signing the

Stipulation for Entry of Judgment admitting to defrauding multiple victims out of millions.[12]

36.  On February 13, 2023, ENGEL returned to the United States. ENGEL booked a flight scheduled to depart on March 8, 2023, from Los Angeles International Airport to Switzerland with an ending destination in Tel Aviv, Israel.  According to information from a law enforcement database, I learned that ENGEL's itinerary showed a one-way flight to Israel without any return travel booked.

37.  Review of bank records for bank accounts belonging to ENGEL show that ENGEL sent over approximately $4 million of the proceeds from the victims' funds overseas to companies and individuals in Israel.

38.  On March 8, 2023, ENGEL was arrested by law enforcement pursuant to this investigation at Los Angeles International Airport. In connection with furnishing information pursuant to booking, ENGEL told me that his "home address" was in Israel.

39.  Also on March 8, 2023, I spoke to an enforcement attorney with the Securities and Exchange Commission, Western Region, located in Los Angeles, who advised me that she is

---

[12] Based on my review of that database, I am also aware that ENGEL traveled to Israel approximately six times between in or about March 2019 and 2020.

familiar with this case.  In connection with speaking to the SEC
enforcement attorney, I again reviewed the SEC's complaint
against ENGEL, filed January 12, 2023, that alleged that ENGEL,
among other things, "used his community ties to perpetrate a $47
million affinity fraud" on facts consistent with those described
in this affidavit.  (*See* paragraph 34, above).  The SEC
enforcement attorney told me that, based upon her review of
funds analyses by an SEC accountant assigned to the SEC matter,
ENGEL withdrew millions during the period of the fraud as
alleged in the complaint and that the balances in the bank
accounts through which those fraud funds flowed were
substantially zero prior to ENGEL's relocation to Israel in or
about March 2021.

40.  I also checked law enforcement flight records and
learned that ENGEL's wife, Gita Lichter, and ENGEL's three minor
children, flew to Israel on the same day in or about June 2021
and have not returned to the U.S. since that time.

41.  I also interviewed ENGEL's sub-tenant, E.F..  E.F.
told me that he (E.F.) had rented a space from ENGEL at ENGEL's
office on La Brea Avenue in Los Angeles.  E.F. told me that
ENGEL left that space in or about March 2021, leaving E.F.
without a lease agreement with the landlord.

42.  Finally, FBI SA Kyle Schultz saw ENGEL arrive at the
airport in a luxury vehicle that was part of a service that

would drop passengers off directly at the aircraft, and that SA Schultz saw the vehicle transport ENGEL on the tarmac and up to the awaiting aircraft.

## V.   CONCLUSION

43.   For all the reasons described above, there is probable cause to believe that from approximately September 2018 through January 2021, within the Central District of California, YOSSI ENGEL committed violations of 18 U.S.C. § 1343 (wire fraud).


Attested to by the application in accordance with the requirement of Fed. R. Crim. P. 4.1 by Telephone on this _____10th____ day of March, 2023.

_____            MRW
UNITED STATES MAGISTRATE JUDGE